UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALBERT LEE ST. CLAIR, JR.,**

**Plaintiff,**

**v.** **Case No. 8:21-cv-2581-MSS-AEP**

**GRADY JUDD,**

**Defendant.**

---

**ORDER**

**THIS CAUSE** comes before the Court on Defendant Sheriff Grady Judd's Motion for Summary Judgment, (Dkt. 53), and *pro se* Plaintiff Albert Lee St. Clair, Jr.'s response in opposition thereto.[1] (Dkt. 57) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS in part and DENIES in part** Sheriff Judd's Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background and Procedural History

This case arises from St. Clair's confinement as a pretrial detainee at the Polk County Jail from April 2019 to October 2022. (Dkt. 52-2 at 2) He initiated this action by filing a civil-rights Complaint under 42 U.S.C. § 1983, challenging as unconstitutional a wide variety of jail conditions. (Dkt. 1) St. Clair verified the Complaint by declaring "under penalty of perjury" that its allegations were "true and

[1] Although afforded the opportunity, Sheriff Judd did not file a reply.

correct." (Id. at 24) Therefore, the Complaint must be "treated as testimony" for purposes of summary judgment. Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019); see also Walker v. Poveda, 735 F. App'x 690 (11th Cir. 2018) ("[Plaintiff] verified his complaint . . . in accordance with 28 U.S.C. § 1746 by attesting to the truth of his factual assertions under penalty of perjury, and we have held that pleadings verified under § 1746 are admissible (and may substitute for sworn affidavits) on summary judgment.").[2]

According to the Complaint, the cells at the Polk County Jail were "overcrowded" and uncomfortable. (Dkt. 1 at 19) For "30 months," St. Clair was housed in an "approximately" 343-square-foot cell with eight other inmates. (Id. at 16, 19) These cells were "originally designed for [six] inmates." (Id. at 19) They lacked "tables or chairs," and the bottom bunks did "not have enough headroom to be able to sit up." (Id. at 16) During St. Clair's time at the Polk County Jail, Sheriff Judd followed a "policy" of locking down "all non-open bay dorms for 23 hours per day." (Id. at 12) As a result, St. Clair was forced to "lie on his bunk close to 23 hours per day." (Id. at 16) Moreover, he had "only one hour per day" to make phone calls and access the "kiosk," which contained "inmates' legal work, legal research, personal mail," and "e-mail." (Id. at 12) According to St. Clair, the lockdown policy applied only to male inmates. (Id. at 14) Female inmates, by contrast, were allowed to spend six hours outside their cells every day. (Id.)

[2] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

The Complaint also states that Sheriff Judd instituted a policy of placing all occupants of a cell "on 24-hour lockdown for the actions of one inmate." (Id. at 21) The lockdowns were imposed "without any due process procedures for the [non-offending] inmates." (Id.) St. Clair elaborated on this policy in his deposition. He testified that if an inmate "holler[ed] out their door or sa[id] a cuss word or something like that to one of the deputies," the deputy would lock down the entire nine-man cell and falsely claim that it was "for sanitation purposes." (Dkt. 52-1 at 22) Instead of instituting disciplinary proceedings against the offending inmate, the deputy would "punish[ ] eight people . . . for the actions of one" without providing any "due process" to the inmates. (Id.) St. Clair further testified that "all of [the deputies were] allowed to" mete out collective punishment in this fashion, and that the practice had "always been happening" at the jail. (Id. at 68-69)

Next, the Complaint states that Sheriff Judd enacted policies restricting the reading material available to inmates. From April 2019 to November 2021, St. Clair was forbidden from ordering "books of his choice," "legal books," newspapers, or magazines; instead, only "religious material" could be "sent in." (Dkt. 1 at 13-14, 20; Dkt. 52-1 at 108-09) During his deposition, St. Clair explained that "[w]e [were] not allowed to order nothing in. We could get a Bible in. That's pretty much about it." (Dkt. 52-1 at 91) St. Clair further testified that in November 2021, he received a notice on the "kiosk" that the jail would "start allowing inmates to receive reading material."[3]

[3] St. Clair took advantage of the change in policy, sending the following message to his mother in July

(Id.) St. Clair acknowledged that the jail had a "book cart," but he stated that "the book cart had ripped up books in it and it didn't have hardly [any] good reading material. Some of them were just half books and all, a lot of pages missing. And you only [got] that thing once a month if you were lucky." (Id. at 92)

In addition, according to the Complaint, Sheriff Judd followed a policy of isolating "inmates [who] test[ed] positive for COVID-19 for 14 days." (Dkt. 1 at 15) While in isolation, inmates had no "means to communicate with family," could not use the "kiosk," and were "denied access to the phone" and "e-mail." (Id. at 15, 22)

Finally, the Complaint states that Sheriff Judd initially permitted free hour-long sessions of "video visitation" if the visitor "drove to the jail," but the policy was later changed to allow "only [two] 20 min[ute] [video] visitations costing the visitor [$]10 per session." (Id. at 21) St. Clair testified at his deposition that his mother is not "technically inclined" and could not figure out how to "schedule a [video] visit" with him. (Dkt. 52-1 at 87)

St. Clair asserts that the conditions at the Polk County Jail damaged his physical and mental health. (Dkt. 1 at 17) He allegedly gained 50 pounds, experienced "elevated" cholesterol levels, and became "pre-diabetic." (Id.) St. Clair was also placed on "sinus" and "heartburn" medication. (Id.) In addition, he became "severely depressed," causing him to be placed on unspecified "medication." (Id.) As relief, St.

---

2022: "hey can you call a book store and find out how much it would cost . . . for them to ship me two books get the price per each please they now let us receive book[s] if they are sent from the supplier." (Dkt. 52-6 at 320) Before the new policy was implemented, St. Clair had filed a grievance about the ban on receiving reading material. (Dkt. 52-1 at 95-96)

Clair seeks $500,000 in compensatory damages, $250,000 in punitive damages, and the reversal of the allegedly unlawful policies described above. (Id. at 5, 24)

The Court screened the Complaint under 28 U.S.C. § 1915A, allowing the following claims to proceed against Sheriff Judd in his official capacity:

- A Fourteenth Amendment conditions-of-confinement claim based on the allegation that St. Clair's cell was too small, "overcrowded," and lacked "tables or chairs."
- A Fourteenth Amendment procedural due process claim based on the allegation that entire cells were "locked down for twenty-four hours without due process [because of] the actions of only one inmate."
- First Amendment claims based on the restrictions on St. Clair's reading material, the fees charged for "video visitation sessions," the limitation "to one hour per day . . . for making phone calls and reviewing letters and personal email," and the inability to communicate with family and friends during COVID-related quarantines.
- A Fourteenth Amendment equal protection claim based on the allegation that "female inmates [were] afforded more time out of their cells than male inmates."

(Dkt. 14 at 4-9)

Following service of process, Sheriff Judd moved to dismiss the Complaint. (Dkt. 25) The Court denied the motion, and the case proceeded to discovery. (Dkts. 37, 38, 42)

### B. Sheriff Judd's Motion for Summary Judgment

Sheriff Judd moves for summary judgment, arguing that St. Clair "failed to show that his constitutional rights were violated while he was incarcerated," and that even if a constitutional violation occurred, no evidence established that "an official policy or practice was the moving force that caused the alleged violation of [his]

constitutional rights." (Dkt. 53 at 1) In support, Sheriff Judd submits an affidavit by Michael Allen, the Chief of Detention for the Polk County Sheriff's Office. (Dkt. 52-2) As discussed below, Allen disputes St. Clair's assertions about jail policies and conditions. For example, Allen states that jail officials do not "place an entire housing area on lockdown as punishment for the conduct of one inmate." (Id. at 6) In addition to Allen's affidavit, Sheriff Judd submits several written jail policies, records of St. Clair's telephone calls and electronic messages, and St. Clair's deposition transcript. (Dkt. 52)

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Whether a fact is material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of showing that no genuine issue of material facts exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-movant. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party satisfies its burden for a motion for summary judgment by showing that there is no evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1171, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has satisfied its burden, the non-moving party must then designate specific facts, by its own affidavits, depositions, answers to interrogatories, or admissions on file, that show there is a genuine dispute of material fact. Porter v. Ray, 461 F.3d 1315, 1320-21 (11th Cir. 2006) (citation omitted). At this stage, the non-moving party must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III. DISCUSSION

The Court considers each of St. Clair's claims in turn. For the reasons explained below, Sheriff Judd is not entitled to summary judgment on the conditions-of-confinement claim, the procedural due process claim, or the claim based on the restriction of reading material. Summary judgment is warranted, however, on the claims concerning video visitation, limitations on communication with family and friends, and the disparate treatment of male and female inmates. Finally, Sheriff Judd is entitled to summary judgment on St. Clair's request for injunctive relief.

### A. Conditions of Confinement

A reasonable jury could find that the conditions in St. Clair's cell violated the Fourteenth Amendment. As noted above, St. Clair sues Sheriff Judd in his official

capacity. Thus, the claim against Sheriff Judd is effectively a claim against Polk County. See Ireland v. Prummell, 53 F.4th 1274, 1288 (11th Cir. 2022) ("[Plaintiff's] Estate brought suit against Sheriff Prummell in his official capacity. Thus, the Estate's suit against Prummell is, in essence, a suit against Charlotte County."). "The touchstone of [a] § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of civil rights protected by the Constitution." Hoefling v. City of Miami, 811 F.3d 1271, 1280 (11th Cir. 2016). "A plaintiff can establish that an official policy caused the deprivation of his constitutional rights by identifying a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Christmas, 76 F.4th at 1329.

A plaintiff seeking to show unconstitutional conditions of confinement must clear a "high bar" by demonstrating "extreme deprivations." Chandler v. Crosby, 379 F.3d 1278, 1298 (11th Cir. 2004). A deprivation is "extreme" if it "objectively exposes the [inmate] to a substantial risk of serious harm." Christmas v. Nabors, 76 F.4th 1320, 1331 (11th Cir. 2023). This standard guarantees that inmates will not be "deprive[d] . . . of the minimal civilized measure of life's necessities." Chandler, 379 F.3d at 1289. Once an extreme deprivation is shown, a plaintiff must then establish that the risk of harm was "so obvious" that "the municipality can reasonably be said to have been deliberately indifferent to" the risk. Daniels v. City of Hartford, 645 F. Supp. 2d 1036, 1057 (M.D. Ala. 2009).

In his verified Complaint, St. Clair asserts that for "30 months," he was housed in an "approximately" 343-square-foot cell with eight other inmates. (Dkt. 1 at 16, 19) These cells were "originally designed for [six] inmates," they lacked "tables or chairs," and the bottom bunks did "not have enough headroom to be able to sit up." (Id. at 16, 19) Additionally, because Sheriff Judd followed a "policy" of locking down "all non-open bay dorms for 23 hours per day," St. Clair was forced to "lie on his bunk close to 23 hours per day." (Id. at 12, 16) According to St. Clair, the conditions in his cell harmed his physical and mental health, causing him to gain 50 pounds, become "pre-diabetic," and develop severe depression. (Id. at 17)

Viewed in the light most favorable to St. Clair, these assertions would allow a reasonable jury to infer that the conditions in the cell "objectively expose[d] [him] to a substantial risk of serious harm." Christmas, 76 F.4th at 1331; see also Williams v. Edwards, 547 F.2d 1206, 1215 n.8 (5th Cir. 1977) ("[G]enerally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate.");[4] Turley v. Bedinger, 542 F. App'x 531, 533 (7th Cir. 2013) (inmate stated conditions-of-confinement claim based on allegation "that his tiny, cramped, poorly ventilated cell, exacerbated by his inability to leave it for exercise, caused his joint pain, respiratory difficulty, gastrointestinal problems, and anxiety"). Likewise, St. Clair's assertions permit a reasonable inference that the risk of harm was "so obvious" that

[4] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

"the municipality [could] reasonably be said to have been deliberately indifferent to" the risk. Daniels, 645 F. Supp. 2d at 1057.

A rational jury could also find that "an official policy caused the deprivation of [St. Clair's] constitutional rights." Christmas, 76 F.4th at 1329. As noted above, a plaintiff may satisfy this standard "by identifying a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Id. According to the verified Complaint, the overcrowding at Polk County Jail was pervasive, with all inmates occupying cramped nine-man cells designed for six inmates. (Dkt. 1 at 16, 19) Moreover, the challenged conditions were present for "30 months." (Id. at 16) Taken as true, these assertions are sufficient to show that the conditions in St. Clair's cell resulted from an unofficial custom. See Anela v. City of Wildwood, 790 F.2d 1063, 1069 (3d Cir. 1986) (municipality "may be held liable" for "jail conditions" where "[t]he description of the cells revealed a long-standing condition that had become an acceptable standard and practice for the" municipality).

Sheriff Judd argues that summary judgment is warranted because St. Clair "has no competent evidence from which to substantiate his allegations—nothing beyond his opinion that the conditions constituted an extreme deprivation." (Dkt. 53 at 8) But St. Clair's Complaint is "verified under 28 U.S.C. § 1746," which means that his allegations "may be viewed as evidence" for purposes of summary judgment. Howard v. Memnon, 572 F. App'x 692, 694 (11th Cir. 2014). Moreover, St. Clair plainly has "personal knowledge" of conditions in the Polk County Jail, having resided there for

over three years. Id. A "litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." United States v. Stein, 881 F.3d 853, 857 (11th Cir. 2018).

Sheriff Judd also disputes St. Clair's description of the cells. In support, Sheriff Judd relies on the affidavit by Chief of Detention Allen, who states that "inmates assigned to [St. Clair's dorm] were provided access to seating and table surfaces, including chairs and tables, within the housing area for meals, writing, and other routine activities."[5] (Dkt. 52-2 at 3) Allen also claims that St. Clair gained 50 pounds not because of "housing conditions and limited movement," but rather because he routinely consumed "canteen or commissary food items" in addition to regular meals. (Id. at 4-5) Finally, Allen asserts that the cells measured "approximately . . . 380.4" square feet rather than 343 square feet. (Id. at 3) Again, however, St. Clair's sworn statements are admissible as evidence, and they contradict Allen's account of jail conditions. Summary judgment is not the appropriate procedure to resolve a "swearing contest between interested witnesses."[6] Joassin v. Murphy, 661 F. App'x 558, 560 (11th Cir. 2016).

---

[5] In his affidavit, Allen uses the term "housing area" to refer to a cell holding "nine inmates." (Dkt. 52-2 at 3)

[6] Relatedly, Sheriff Judd contends that St. Clair presents no evidence connecting his "fifty-pound weight gain," "severe depression," and "pre-diabetic state" to the conditions of his confinement. (Dkt. 53 at 22) A rational jury could find, however, that St. Clair's physical and mental-health issues were "a reasonably foreseeable consequence of" spending a lengthy period in the conditions described by St. Clair, and that his health issues "would not have occurred" had he not been exposed to those conditions. Buckman v. Halsey, No. 20-13596, 2021 WL 4127067, at *3 (11th Cir. Sept. 10, 2021).

### B. Procedural Due Process

A reasonable jury could find that St. Clair's right to procedural due process was violated by the lockdowns imposed on entire cells for the actions of one inmate. "[A] pretrial detainee is entitled to a due process hearing before being subjected to conditions that amount to punishment." Jacoby v. Baldwin Cnty., 835 F.3d 1338, 1348 (11th Cir. 2016). "[W]hether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." Id. at 1348 n.5. "[L]egitimate governmental objectives and alternative purposes justifying a particular condition or restriction include insuring the detainees['] presence at trial, effectively managing the detention facility, maintaining order and security, excluding weapons and drugs, and others." Hughes v. Judd, 108 F. Supp. 3d 1167, 1218 (M.D. Fla. 2015).

According to St. Clair, Sheriff Judd instituted a policy of placing all occupants of a cell "on 24-hour lockdown for the actions of one inmate." (Dkt. 1 at 21) The lockdowns were imposed "without any due process procedures for the [non-offending] inmates." (Id.) For example, if an inmate "holler[ed] out their door or sa[id] a cuss word or something like that to one of the deputies," the deputy would lock down the entire nine-man cell and falsely claim that it was "for sanitation purposes." (Dkt. 52-1 at 22) Instead of instituting disciplinary proceedings against the offending inmate, the deputy would "punish[ ] eight people . . . for the actions of one" without providing any "due process" to the inmates. (Id.) St. Clair testified at his deposition that the lockdowns happened "all the time" during his incarceration at the jail. (Dkt. 52-1 at

68) He also explained that deputies used this "tactic" because if "one person" caused a "lockdown" for "everyone in the cell," the inmates "would take care of it themselves and . . . beat that person or hurt that person in [the cell]." (Id. at 22-23)

Viewed in the light most favorable to St. Clair, these assertions support a reasonable inference that the lockdowns were "imposed for the purpose of punishment . . . [rather than a] legitimate government purpose." Jacoby, 835 F.3d at 1348 n.5. A reasonable jury could conclude that deputies acted "arbitrar[ily]"—and thus with the "intent to punish"—when they locked down a nine-man cell based solely on alleged misconduct by one inmate. Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004). Notably, Sheriff Judd does not contend that lockdowns conducted in this manner would serve a legitimate government purpose. Instead, he relies on Chief of Detention Allen's assertion that "[t]he Polk County Sheriff's Office does not maintain any policy or practice of imposing twenty four-hour punitive lockdowns, nor does it place an entire housing area on lockdown as punishment for the conduct of one inmate." (Dkt. 52-2 at 6) But St. Clair offers competent testimony to rebut these assertions, and "[w]hen factual conflicts arise [on summary judgment], [courts] must credit the nonmoving party's version."[7] Blanco v. Samuel, 91 F.4th 1061, 1070 (11th Cir. 2024).

[7] A reasonable jury could also find that "an official policy caused the deprivation of [St. Clair's] constitutional rights." Christmas, 76 F.4th at 1329. St. Clair testified that "all of [the deputies were] allowed to" collectively punish inmates in the manner described above, and that the practice had "always been happening" at the jail. (Dkt. 52-1 at 68-69) This testimony points to the existence of a "widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Christmas, 76 F.4th at 1329.

In short, a triable issue exists as to whether the lockdowns were "imposed for the purpose of punishment." Jacoby, 835 F.3d at 1345. Thus, a jury could reasonably conclude that St. Clair's right to due process was violated when deputies imposed the lockdowns without providing any procedural protections to the affected inmates. The required protections would include, at a minimum, "(1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present evidence when permitting [the inmate] to do so will not be unduly hazardous to institutional safety or correctional goals." Id. at 1350.

**C. Restrictions on Reading Material**

Summary judgment is not warranted on St. Clair's claim that Sheriff Judd violated the First Amendment by restricting the reading material available to inmates. "The First Amendment protects 'the right to receive information and ideas,' which, as applicable in the prison context, extends to the right to receive mail and to access reading material." Bethel v. Jenkins, 988 F.3d 931, 938 (6th Cir. 2021) (quoting Kleindienst v. Mandel, 408 U.S. 753, 762 (1972)). "At the same time, the Supreme Court has acknowledged that running a prison 'is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.'" Pesci v. Budz, 935 F.3d 1159, 1165 (11th Cir. 2019) (quoting Turner v. Safley, 482 U.S. 78, 85 (1987)).

"In an effort to vindicate both 'the need to protect constitutional rights' and the need for 'judicial restraint regarding prisoner complaints,' [the Supreme Court] set out the ground rules for evaluating prisoners' constitutional claims: When a prison regulation or policy 'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" Id. (quoting Turner, 482 U.S. at 85, 89)). To make this determination, courts ask "(1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an exaggerated response to prison concerns." Hakim v. Hicks, 223 F.3d 1244, 1247-48 (11th Cir. 2000). Although St. Clair "bear[s] the ultimate burden of showing that the [challenged] policy is unconstitutional, it is [Sheriff Judd's] burden to demonstrate that a rational connection exists between the policy and a legitimate penological interest." Fontroy v. Beard, 559 F.3d 173, 177 (3d Cir. 2009).

Sheriff Judd fails to meet his burden. According to St. Clair, from April 2019 to November 2021, inmates were forbidden from ordering "books of [their] choice," "legal books," newspapers, or magazines; instead, only "religious material" could be "sent in." (Dkt. 1 at 13-14, 20; Dkt. 52-1 at 108-09) St. Clair clarified at his deposition that "[w]e [were] not allowed to order nothing in. We could get a Bible in. That's pretty much about it." (Dkt. 52-1 at 91) Sheriff Judd does not put forward any

"legitimate governmental interest" to justify such a policy. Hakim, 223 F.3d at 1247. Instead, he appears to dispute its existence, citing Allen's statement that the jail did not "maintain a blanket ban on newspapers or approved publications." (Dkt. 52-2 at 9) According to Allen, inmates could receive "approved reading materials, including religious or educational publications, through incoming mail from family members or other approved senders, subject to inspection and institutional safety requirements." (Id. at 9-10) Again, however, St. Clair presents competent testimony to rebut this assertion, and "[w]hen factual conflicts arise [on summary judgment], [courts] must credit the nonmoving party's version." Blanco, 91 F.4th at 1070.

Because Sheriff Judd identifies no "legitimate penological interest[ ]" that could justify the policy described by St. Clair, summary judgment is unwarranted on this claim. Pesci, 935 F.3d at 1165. Notably, some courts have held that a "*de facto* total ban on all publications sent by mail" violates the First Amendment because it is "not reasonably related to legitimate penological interests." Hum. Rts. Def. Ctr. v. Baxter Cnty., 667 F. Supp. 3d 959, 974 (W.D. Ark. 2023), aff'd, 129 F.4th 498 (8th Cir. 2025); see also Prison Legal News v. Nw. Reg'l Jail Auth., No. 5:15-cv-61, 2017 WL 4415659, at *5 (W.D. Va. Sept. 29, 2017) ("Where a regulation is, or is akin to, a 'blanket' prohibition [on inmates receiving certain categories of publications,] courts seem more likely to rule it unconstitutional." (collecting cases)); Marcum v. Jones, No. 06-cv-822, 2009 WL 3172048, at *3 (S.D. Ohio Sept. 30, 2009) ("[D]efendants have not produced sufficient evidence in support of their motion for summary judgment to show that the total ban on publications, magazines, tabloids and newspapers received

through the mail at the Hanover and Resolutions facilities is reasonably related to legitimate penological objectives."). To be clear, the Court makes no finding on the constitutionality of the alleged policy. Instead, the Court holds only that Sheriff Judd is not entitled to summary judgment because, to this point, he has not discharged his "burden to demonstrate that a rational connection exists between the policy and a legitimate penological interest." Fontroy, 559 F.3d at 177.

### D. Video Visitation

No reasonable jury could find that the change in the video visitation policy violated St. Clair's First Amendment rights. According to St. Clair, Sheriff Judd initially permitted free hour-long sessions of "video visitation" if the visitor "drove to the jail," but the policy was later changed to allow "only [two] 20 min[ute] [video] visitations costing the visitor [$]10 per session." (Dkt. 1 at 21) St. Clair testified at his deposition that he believed each inmate was entitled to two such sessions "per week," but he was not sure because he "never got to get one." (Dkt. 52-1 at 90) He explained that his mother is not "technically inclined" and could not figure out how to "schedule a [video] visit" with him. (Id. at 87)

Viewed in the light most favorable to St. Clair, these assertions do not establish a constitutional violation. To the extent that St. Clair challenges the $10 fee charged for video visitation, the First Amendment "does not prohibit charging prisoners for essential prison services, at least in the absence of a showing that the result is a severe deprivation of a fundamental right." Holloway v. Magness, 666 F.3d 1076, 1080 (8th Cir. 2012) (rejecting prisoner's First Amendment challenge to allegedly excessive

telephone charges); see also Nelson v. Hjorth, No. 8:18-cv-88, 2018 WL 2050571, at *8 (D. Neb. May 2, 2018) ("[F]ederal courts . . . have consistently rejected First Amendment claims challenging high telephone rates on grounds that prisoners are not entitled to a specific rate for telephone calls and that prisoners failed to allege that the rates were so exorbitant as to deprive them of telephone access altogether." (collecting cases)). St. Clair does not present any evidence that the $10 fee was "so exorbitant as to deprive prisoners of . . . access altogether." Johnson v. State of California, 207 F.3d 650, 656 (9th Cir. 2000). Thus, he fails to show that the fee violated his constitutional rights.

As noted above, St. Clair claims that he was unable to have video visits with his mother because she lacked the technical know-how to "schedule a visit." (Dkt. 52-1 at 87) According to St. Clair, his mother went to "Best Buy or one of these technical places . . . to try to get it set up," but she could not afford to pay the "150, 160 bucks" it would cost to receive such assistance. (Id. at 87-88) St. Clair also stated that "[e]ven if they tried to set it up on the phone, [his] mom still did not know how to . . . do all that stuff." (Id. at 88) St. Clair does not cite—and this Court cannot locate—any authority suggesting that the video visitation policy is unconstitutional because individuals may face technical difficulties in using the program. Moreover, although St. Clair did not have any video calls with his mother, he acknowledged that he was able to call her on the telephone throughout his incarceration, and he routinely exchanged emails with her. (Id. at 89; Dkt. 52-6; Dkt. 52-11) Inmates "retain a right under the First Amendment to send and receive information while incarcerated," but

"they do not have a constitutional right to a particular form of communication." Kersaint v. Daniel, No. 7:25-cv-38-WLS-ALS, 2025 WL 2648234, at *6 (M.D. Ga. Sept. 15, 2025) (collecting cases).

### E. Limitations on Outside Communication

Sheriff Judd is also entitled to summary judgment on St. Clair's claims that (1) he had only "one hour per day" for making phone calls and reviewing letters and personal email on the kiosk, and (2) he was unable to communicate with family and friends during COVID-related quarantines. (Dkt. 1 at 12, 15, 22)

As to the first claim, St. Clair fails to present "facts showing a significant infringement of his right to communicate with the outside world." Holloway, 666 F.3d at 1081. As Chief of Detention Allen notes, St. Clair "made substantial use of the inmate telephone system during his incarceration." (Dkt. 52-2 at 8) The records show that "[b]etween February 2021 and September 2022 alone, [St. Clair] initiated approximately 570 telephone call attempts, including over 200 completed calls, totaling more than 2,400 minutes of call time." (Id.; see also Dkt. 52-11) Moreover, as Allen points out, St. Clair "exchanged numerous electronic messages with outside contacts during the period of his confinement, including during the time when COVID-19 operational protocols were in effect." (Dkt. 52-2 at 7-8) Indeed, the record includes 357 pages of electronic messages between St. Clair and outside contacts from April 2019 to September 2022. (Dkt. 52-6) Given St. Clair's extensive contacts with friends and family via phone calls and electronic messaging, no reasonable jury could find that any outside communication restrictions were enforced in violation of the First

Amendment. See Lopez v. Morrison, No. 22-cv-6607-KMW-AMD, 2022 WL 17417120, at *2 (D.N.J. Dec. 5, 2022) ("While detained individuals have a First Amendment right to communicate, including to communicate with family and friends, that right is not inviolable and does not include unfettered access to any and all forms of communication at all times.").

St. Clair separately challenges the policy of isolating "inmates [who] test[ed] positive for COVID-19 for 14 days." (Dkt. 1 at 15) While in isolation, inmates had no "means to communicate with family," could not use the "kiosk," and were "denied access to the phone" and "e-mail." (Id. at 15, 22) These assertions are insufficient to establish a constitutional violation.

Inmates' right to communicate with outside parties is "subject to rational limitations in the face of legitimate interests of the penal institution." Jackson v. Ward, No. 6:19-cv-91, 2022 WL 866340, at *3 (S.D. Ga. Mar. 1, 2022), adopted by 2022 WL 854819 (S.D. Ga. Mar. 22, 2022). In response to St. Clair's allegations, Chief of Detention Allen states that "[t]emporary limitations on . . . communication during COVID-related quarantines were implemented as part of . . . infection-control measures and were based on medical and operational considerations consistent with the agency's epidemic response procedures." (Dkt. 52-2 at 9) Thus, any limitations on communication during the two-week quarantine periods "appear[ ] to be rationally related to the need to prevent possible spread of COVID-19." McGlory v. Michigan Dep't of Corr., No. 2:20-cv-81, 2020 WL 4362307, at *3 (W.D. Mich. July 30, 2020) (no constitutional violation where plaintiffs "were held in a cell for a period of eight

days without access to a phone or mail because of a need to quarantine them after their potential exposure to COVID-19"). St. Clair offers no evidence that the temporary restrictions on communication were unreasonable or failed to advance the legitimate goal of combating the spread of COVID-19. Therefore, no triable issue exists as to the constitutionality of these restrictions.

**F. Equal Protection**

Sheriff Judd is entitled to summary judgment on St. Clair's equal protection claim. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1318-19 (11th Cir. 2006). "A similarly situated prisoner must be prima facie identical in all relevant respects." Sumrall v. Georgia Dep't of Corr., 154 F.4th 1304, 1312 (11th Cir. 2025). In determining whether male and female inmates are similarly situated, "[c]ourts should consider the number of inmates housed in each facility, their average length of stay, their security levels, and the incidence of violence and victimhood." Oliver v. Scott, 276 F.3d 736, 746 (5th Cir. 2002).

St. Clair's equal protection claim fails because he presents no evidence that he was "similarly situated" to the female inmates who allegedly "received more favorable

treatment." Sweet, 467 F.3d at 1318. As explained above, St. Clair alleges that Sheriff Judd followed a "policy" of locking down "all non-open bay dorms for 23 hours per day." (Dkt. 1 at 12) According to St. Clair, the lockdown policy applied only to male inmates. (Id. at 14) Female inmates, by contrast, were allowed to spend six hours outside their cells every day. (Id.) At his deposition, St. Clair explained that he learned of this disparity by talking to "girls in the medical" unit and unidentified "officers" who told him that female inmates were "out six hours a day." (Dkt. 52-1 at 78) St. Clair could not "identify any female inmate" he spoke to, nor did he know their "custody level[s]" or in which dorms they resided. (Id. at 79-81)

As this summary makes clear, St. Clair presents no "details"—such as the female inmates' security levels or the incidence of violence in their dorms—"that would allow [the Court] to assess whether they were similarly situated" to St. Clair. Sumrall, 154 F.4th at 1313. Without such information, no reasonable jury could conclude that the female inmates were "prima facie identical [to St. Clair] in all relevant respects."[8] Id. at 1312. Additionally, St. Clair offers no evidence to rebut Chief of Detention Allen's assertion that "[i]nmate gender alone does not determine out-of-cell time, recreation opportunities, or daily movement schedules; rather, such decisions are based on objective classification factors and legitimate operational needs, including temporary public-health measures such as COVID-19 mitigation protocols when in effect." (Dkt. 52-2 at 13) Therefore, St. Clair fails to establish a genuine

[8] At his deposition, St. Clair stated that his security level was "medium and sometimes high." (Dkt. 52-1 at 28)

dispute of material fact as to his equal protection claim. See Simmonds v. Cockrell, 81 F. App'x 488, 489 (5th Cir. 2003) ("Because [plaintiff] has not shown that male and female prisoners in the Texas prisons are similarly situated, the district court did not err in dismissing his equal protection claim.").

### G. Injunctive Relief

In his Complaint, St. Clair appears to seek the reversal of the challenged jail policies. (Dkt. 1 at 5) But St. Clair no longer resides at the Polk County Jail. After he filed this lawsuit, he was sent to the Florida Department of Corrections to serve his prison sentence. (Dkt. 8) Later, he completed his sentence and moved to Illinois. (Dkt. 34) "The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief." McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1363 (11th Cir. 1984); see also Smith v. Allen, 502 F. 3d 1255, 1267 (11th Cir. 2007) ("[A] transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011). Because St. Clair is no longer incarcerated at the Polk County Jail, his request for injunctive relief must be dismissed as moot. See Brown v. Riley, No. 2:08-cv-804-JES-DNF 2010 WL 3069490, at *10 (M.D. Fla. Aug. 4, 2010) (granting summary judgment as to former prisoner's "request for injunctive relief" because the request was "moot in light of his release from the Department of Corrections").

## IV. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Sheriff Judd's Motion for Summary Judgment, (Dkt. 53), is **GRANTED in part and DENIED in part**.
   a. Summary judgment is **GRANTED** as to the request for injunctive relief as well as the claims concerning video visitation, limitations on communication with family and friends, and the disparate treatment of male and female inmates.
   b. Summary judgment is **DENIED** as to the conditions-of-confinement claim, the procedural due process claim, and the claim based on the restriction of reading material.
2. The Parties must confer in good faith to discuss the possibility of settling the remaining claims in this action. Within **FORTY-FIVE DAYS** of this Order, the Parties must notify the Court whether they are able to reach a settlement. If the Parties are unable to settle the case privately among themselves, they must notify the Court if they wish to have the case referred to a United States Magistrate Judge for a settlement conference.
3. To allow the Parties sufficient time to confer regarding settlement, the Court **STAYS** all upcoming case deadlines and removes this case from the August 2026 trial term. If the Parties are unable to reach a settlement, the Court will enter an Amended Case Management and Scheduling Order and set new pre-trial management deadlines and a new trial term.

**DONE** and **ORDERED** in Tampa, Florida, this 21st day of July 2026.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE